GEORGE FITZHUGH AND OTHERS *vs.* WILLIAM S. MC-PHERSON, *adm'r d. b. n. of* LEWIS NETH.—*June,* 1837.

The objection, that a commissioner to take evidence under a commission from chancery, had not taken the oath annexed to the commission, is excluded from the consideration of this court by the act of 1832, ch. 302, it not having been made the ground of exception before the chancellor.

Exceptions filed in chancery under the act of 1832, ch. 302, after the decree, will not avail.

The design of the legislature was that the grounds of objection adverted to in the act of 1832, ch. 302, should be taken by exceptions filed in the cause before the passage of the decree, that the chancellor whilst decreeing, might have them in view, and that the opposite party might resort to the appropriate means of obviating their effects in chancery.

One of several defendants in equity who had answered the original bill, need not answer an amended bill, the points of amendment not affecting his interest in any way.

Defendants in equity who have not answered an original bill, are by an amended bill called on to answer both together; and the subpœna issued on the amended bill, calls for an answer to both.

The recital in a decree that an order to take a bill *pro confesso* unless, &c. had been duly served, is sufficient evidence of the fact of service in the appellate court.

C, as the agent of D, executed an assignment of a mortgage to B, in 1806. The mortgagors for about twenty-five years continued, time after time, to pay to B, and those claiming under him, interest due on the debts assigned. One defendant admitted the appointment of the agent, and others gave bond to the assignee to secure the debt. Under such circumstances, no express proof of the agent's power to make the assignment is necessary.

G. executed a mortgage to secure one debt—G. Jr., D, and M, executed a subsequent mortgage to secure the same and another debt. The mortgagors held different estates in the land, and both the debts came by assignment to the same party. In such a case the chancellor could not decree definitively unless he had all parties before him, and therefore all these subjects could be included in one bill.

An order to take a bill *pro confesso*, unless the defendant answers it by a day given, cannot be anticipated, and a decree *pro confesso* passed in anticipation of such day.

In considering whether a suitor in court is guilty of a wilful default, the court will not impute to him the same degree of knowledge of the practice of the court as that ordinarily possessed by the solicitors.

A party is not liable to pay compound interest on a debt for which he is jointly liable with others, upon their agreement to pay such interest. His assent to such an arrangement must be shown.

An interest may appear to be outstanding, as against one of the defendants in a chancery cause by his admission so as to make its proprietor a necessary party, though at the same time such interest as respects the other defendants, and the complainant in the cause, is barred by lapse of time. The want of such a party in a cause affecting real property and requiring a sale of it, would induce this court to remand the cause under the act of 1832, ch. 302.

Mortgagors cannot agree to compound interest and make it a charge on the mortgaged premises, to the prejudice of any portion of the mortgagees secured by such mortgage, or to the prejudice of subsequent mortgagees of the same property.

The decree which orders a sale of mortgaged property and its proceeds to be brought in for distribution, does not settle the rights of mortgagees *inter se*, and that there may be a conflict between them, after sale, is no ground for reversal.

APPEAL from the court of *Chancery.*

The bill in this cause was filed on the 6th day of April, 1833, by *Samuel Maynard,* administrator *de b. n.* of *Lewis Neth,* alleging that on or about the 10th October, 1791, *George Fitzhugh, the elder,* of *Baltimore* county, (since deceased,) conveyed unto *Walter Dulany,* (since also deceased,) certain real and personal property in trust and by way of mortgage, amongst other things to secure unto one *Daniel Dulany,* since deceased, the payment of the sum of £230, then due and owing from the said *George* to the said *Daniel;* that afterwards *Walter Dulany,* conveyed all the aforesaid property to *Mary Fitzhugh, George Fitzhugh, Jr.* and *Daniel D. Fitzhugh,* and thereupon the said grantees on the 27th April,

1805, conveyed certain real and personal estate unto *Rebecca Dulany,* who was the executrix of the said *Daniel,* and to the said *Walter Dulany,* in trust and by way of mortgage, amongst other things to secure unto the said *Rebecca* as executrix, the payment of the aforesaid sum of £230, and the further sum of £400, *with interest due thereon.* The bill then charged that the debts secured by the said mortgages, have become satisfied, and the trusts thereby created have been fulfilled, excepting only in so far as the same relates to the aforesaid sums of £230, and £400 and interest. That said sums remaining due, the right and title to the same, and the aforesaid mortgage last mentioned as a security therefor, were duly assigned and transferred unto *Lewis Neth,* that on or about the 22d April, 1822, the said *Mary, George* and *Daniel D. Fitzhugh,* came to a settlement with the said *Lewis Neth,* upon which the sum of $5,915, was due, for which they delivered to him their bond of that date, conditioned to pay said last mentioned sum with interest; that on the 26th January, 1825, the said *Mary, George* and *Daniel,* delivered unto *Lewis Neth,* an instrument (exhibit D,) declaring that the aforesaid bond was given for the principal and interest of the debts found by the said mortgage, and that the sum mentioned in said bond was a continuing charge, on the property mentioned in the mortgage. That a large sum is now due to the estate of *Lewis Neth;* that since the execution of the said mortgages, *Mary, George and Daniel D.* have executed another mortgage to *the President and Directors of the Bank of Maryland* of the property aforesaid. Prayer for a sale of the property to pay *Neth's* debt, and for subpœna against *Mary, George* and *Daniel D. Fitzhugh,* and *The Bank of Maryland,* and for general relief.

The deeds referred to were exhibited with the complainant's bill.

The answer of *Daniel D. Fitzhugh,* admitted the mortgage from *George Fitzhugh* to *Walter Dulany,* but denied the alleged death of his father, *George.* It also admitted, the mortgage to *Rebecca,* but denied that the debts secured by

them were paid. It alleged that the debt in the first mort-
gage is due to *Upton Scott*, with interest thereon since 1809;
that the second, was assigned by *Rebecca Dulany*, to
*Thomas Buchanan*; that the whole of the interest due on the
debt of £400, was paid to him up to the 31st March, 1810,
and that the said *debts* afterwards by assignment came to the
said *Lewis Neth*, but the defendant has no knowledge of the
assignments of the *mortgages.* The settlement with and
bond given to *L. Neth*, was admitted to have been made, but
alleged there was a considerable mistake made in the calcu-
lation, and that a less sum was due than was admitted, which
he prayed might be corrected—that a balance is still due.
That exhibit filed with the bill was executed by *George
Fitzhugh, the elder*, who is not made a party, and by *George
Fitzhugh, Jr.* who is made a party. This defendant admits
that he mortgaged a part of the property described in the
proceeding to *The Bank of Maryland*, in which *Mary* and
*George Fitzhugh*, did *not* join; that he still owes the bank
about $1,450. Prayer to be dismissed.

The complainant on the 30th December, 1833, prayed
leave to amend his bill by making *George Fitzhugh, the elder*,
a party defendant, for a discovery whether *George Fitzhugh,
the elder* or *younger* executed the bond to *Lewis Neth*—and
for an order of publication against *Walter* and *Rebecca
Dulany* as absent defendants.

On the 19th December, 1833, the chancellor passed an
order, reciting that the defendants, *George* and *Mary Fitzhugh*
and *The President and Directors of the Bank of Maryland*
being returned attached, for not answering, and not having
answered, and directing the said defendants to answer, before
the 4th day of December term next, otherwise the chancellor
would take the bill *pro confesso*, or direct a commission to
issue to take evidence.

*The Bank of Maryland* then answered, claiming $1,450,
due them from *D. D. Fitzhugh.*

On the 1st day of April, 1834, the chancellor passed an
order, taking the bill *pro confesso*, against the defendants

*George Fitzhugh* and *Mary Fitzhugh*, and ordered a commission, and the same as to *George Fitzhugh, the elder.*

After proof taken in the cause, which is sufficiently adverted to in the opinion delivered in this court, the chancellor on the 12th November, 1835, referred the cause to the auditor to state an account showing the amount due to the complainant. Further testimony was taken before the auditor. The auditor reported six accounts—the complainant objected to five of them, and prayed that account number five should be confirmed. The defendants filed no objections to the auditor's statement prior to the decree ; account number five corresponded with the exhibit filed with the bill, showing the settlement at the time the bond was given to complainant, and the sums since received. This account was confirmed by the chancellor, and the mortgaged premises ordered to be sold by a trustee of the court for the purpose of paying the balance due, according to that account, by his decree of the 7th January, 1836.

In February, 1836, the defendants filed the exceptions to the evidence and the auditor's statements, and then took their appeal to this court.

The cause came on to be argued before STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, Judges.

BELT and G. L. DULANY, for the appellants, contended that the decree of the chancellor ought to be reversed :

1. Because the commissioners did not take the oath annexed to the commission, and their proceedings under the commission are therefore null, and there is no evidence in the cause. *Massey vs. Massey,* 4 *Har. and John.* 144.

2. Because it does not appear from the record that the defendants, in the original bill, were summoned to answer to the amended bill.

3. Because the order, *pro confesso,* of 19th December, 1833, was not served upon *George Fitzhugh* and *Mary Fitzhugh,* by the 25th February, 1834, or at any other time.

4. Because the said order, *pro confesso,* gives the defendants until the 4th of December, 1834, to answer the bill ;

Fitzhugh and others *vs.* McPherson.—1837.

and yet a decree, *pro confesso*, was passed against them on the 1st day of April, 1834.

5. Because there is no evidence that *William Cooke*, who signed the assignment to *Thomas Buchanan*, as the attorney for *Rebecca Dulany*, was the attorney of *Rebecca Dulany*.

6. Because the decree is for the sale of all the lands mentioned in the proceedings for payment of the two debts of £230, and £400, added together, and interest compounded thereon, when complainant's exhibits, A and B, shew that the life estate of *George Fitzhugh, the elder*, in 500 acres, and his fee simple estate in 188 acres, never were charged or chargeable with the payment of the debt of £400.

7. The parties having titles to the mortgaged premises, are *George Fitzhugh, the elder*, who held a life estate in 500 acres, and a fee simple estate in 188 acres, and *Mary Fitzhugh, George Fitzhugh*, and *Daniel D. Fitzhugh*, who held the reversion in fee in the 500 acres; and an agreement to compound the interest, and render it a charge upon the whole property, must be made by all the parties in interest, but complainant's exhibits, C and D, shew that the agreement was made by three only of the four, and whether made by *George Fitzhugh, the elder*, or by *George Fitzhugh, the younger*, is left in uncertainty. Yet the decree is against all four, for the sum of $8,162 22, when the whole sum due from the party who did not enter into the agreement, could only have been $3,400 46, as appears from the auditor's account, No. 6.

8. Because the legal representatives of *Walter Dulany*, deceased, mentioned in complainant's exhibit A, and *Upton Scott*, or his legal representatives, are parties in interest, and should have been parties to the cause.

9. Because the mortgagors cannot, by any agreement, compound the interest on the principal debt, and render the whole a charge upon the lands, to the prejudice of those whose debts are secured by the same mortgage, and of the *Bank of Maryland*, a subsequent mortgagee.

10. Because exhibits A and B, being conveyances of different estates, by different parties, at different times, to secure

(in part) different debts, ought to have been the subjects of separate and distinct bills, and could not properly be embraced in one bill.

ALEXANDER, and R. JOHNSON, for the appellee.

1. The first point relied on is, that it does not appear that the commissioners took the oath which is annexed to the commission, and therefore the testimony is inadmissible; and 4 *Har. and John.* 144, is cited as an authority in support of the position.

On examination it will be found, that in the case cited, a commission had been issued to make partition under the act to direct descents; and the court decided, that the commission and proceedings were defective, because the oath of the commissioners was not annexed to the same, and because the commission and return did not appear to have been ratified by the court, and refused to permit the commission, &c. to be read to the jury.

The court of Appeals affirmed this opinion without assigning their reasons; and may therefore have decided merely that the commission, &c. were inadmissible, because they had not been confirmed by the court. But whatever may have been the grounds of the decision, the case is not in point to show, that testimony is to be suppressed, because it does not appear that the commissioners took the oath prescribed to be taken.

It will be found on referring to 2 *Mad. Ch. Pr.* 413, (and the same rules are laid down in all other books of practice,) that regularly all objections to the execution and return of a commission, should be made before it passes publication; and if the testimony is suppressed, the court will permit a new examination for advancement of justice. In this state, objections are in general permitted to be made at the hearing, but are admitted with the same consequence—that the court will give time to remove the objection by a re-examination or otherwise, in order to prevent the obstruction of justice. And it is apprehended that the *Maryland* practice is to be taken, with the further qualification, that at the hearing in

chancery, (and *a fortiori* upon the hearing of an appeal,) every fair and reasonable intendment will be made in favour of the regularity of the proceeding. If this presumption is admissible, it will destroy the objection here made—which is not, that it does appear that the commissioners did not take the oath—but that it does not appear that they did take it.

Thus would stand the practice, independent of the act of 1832, ch. 302, sec. 5. But by that act it is provided, that " all objection to the competency of witnesses, and the admissibility of evidence, and to the sufficiency of the averments of the bill or petition, shall be made by exceptions filed in the cause. And no point relating to the competency of witnesses, or admissibility of evidence, &c. &c. shall be raised in such causes in the court of Appeals, or noticed, or determined, or acted upon, by the court of Appeals, unless it shall plainly appear in the record, that such point had been raised by exceptions as aforesaid, in the court of Chancery, &c."

An objection to the regularity of the execution and return of a commission, and to the right of the party to use the testimony taken under the same, is an " objection to the admissibility of evidence." Such objection, therefore, cannot in this court, be raised, or noticed, or determined, or acted upon, unless it shall plainly appear by the record, that the same was first raised by exceptions filed in the cause in the court of Chancery. It is incumbent on the appellants then, to show that this same point has been properly raised by exceptions in the court below. Can this be shown?

The final decree is dated on the 7th January, 1836. On the 18th February, 1836, nearly five weeks after the decree, and just as they were about to enter their appeal, the appellants filed their exceptions. Was this a compliance with the act of 1832? The appellee insists that it was not. The leading object of the act was, to prevent a party from springing upon his opponent in the court of Appeals, with objections which might have been obviated, if they had been suggested at any time before the decree. But the decree fixes the state of the parties. No amendment to pleadings or

proofs can be made at any time after a final decree. To gratify the intent as well as the letter of the act, then it must be laid down, that every objection must be filed before the final decree. For if exceptions are allowed to be filed after that event, the act will be virtually repealed by defeating, effectually, its objects.

The language of the act of 1832, is very similar to that of the act of 1825, ch. 117, relating to appeals from judgments of a court of common law. It has never been supposed, that a defect in the bill of exceptions could be insisted on by filing an objection after the judgment was rendered.

The truth is, that the commissioners were sworn, as could have been shown if the objection had been made at an earlier day.

2. The next objection is, that the defendants to the original bill were not summoned to answer to the amended bill.

At the time of filing the amended bill, none of the defendants to the original bill had filed their answers, excepting *Daniel D. Fitzhugh*; and instead of praying *subpœna* against them, it prayed they might answer the amended bill at the time they should answer the original bill.

In 2 *Mad. Ch. Pr.* 369, it is said, that new *subpœnas* are not necessary in an amended bill.

1 *Fowl. Ex. Pr.* 106, an amended bill is considered as an original bill, &c. Those who are defendants to the original bill, and continued parties to the amended bill, need not be served with fresh process to appear to the amended bill; for having once appeared to the original bill, they are bound to answer the amended bill; but if any new parties are added to the amended bill, they must be served with new process, as to an original bill. And in 107, if a bill required to be amended before the defendant appears, it is done without costs; in like manner it may be amended after appearance, and before answer; and also after answer, provided, no further answer is required. And in 108, if the defendant puts in an insufficient answer, to which exceptions are taken, and they are either submitted to by the defendant, or allowed by

the court upon argument, in either of these cases the plaintiff may apply to the court for leave to amend his bill without costs, and that the defendant may answer the exceptions at the same time that he answers the amendments.

1 *Har. Ch. Pr.* 106, it is laid down, that after an appearance, if before answer, the plaintiff may move and obtain an order of course, to amend his bill without costs.

*Wyatt's Pr. Reg.* 66; if a further answer be required, then a *subpœna* to appear and answer amended bill must be served; and therefore, if amendment be made before any answer filed, the new process will be unnecessary.

These authorities are ample to show that no new *subpœna* was necessary to be served on *George* and *Mary Fitzhugh,* who had not answered the original bill.

They are also sufficient to prove, that no new *subpœna* was necessary on *Daniel,* who had answered, as no further answer was required. The only material allegation in the amended bill is, that it is surmised or pretended that the bond and agreement in the proceedings, were executed by *George Fitzhugh, the elder,* and not by *George, the younger;* and an interrogatory is framed for a discovery upon this point. Now the amendment was made on the statements in *Daniel's* answer to the original bill. So that no further answer upon the subject could be required for the purposes of the complainant or defendant. In strictness, perhaps, he ought to have received a formal notice of the amendment. But the case of *Woodhouse vs. Meredith,* 1 *Jac. and Walk.* 204, is in point to show that he has waived his right to insist on any such objection, by joining in the commission, and by taking testimony before the auditor, &c. and other proceedings in the case.

Nothing can be said of the form of the amended bill.

3. It is then said, the order, *pro confesso,* of the 19th December, 1833, was not served on *George Fitzhugh* and *Mary Fitzhugh,* before the 25th February, 1834, or at any other time.

This objection is colourable merely. The record is inaccurate in not setting out all the processes with their returns. But the decree, *pro confesso,* recites that the order, *pro confesso,* had been duly served—and it is presumed that recital will be as satisfactory here, as a copy of the order endorsed, served by some one who may profess to be a sheriff. This court has already decided, that a recital in the decree that the cause was standing ready for hearing, is sufficient to establish that fact, and it would seem that a like recital of service of the order would receive equal respect. *Rigden vs. Martin,* 6 *Har. and John.* 407.

4. That the order, *pro confesso,* gives the defendants time until the fourth day of December term, 1834, to answer; and yet the decree, *pro confesso,* is passed against them on the 11th April, 1834.

This objection is well taken in fact, and it is remarkable that such an error should have been committed, and more especially by a clerk, who is remarkable for his accuracy. Yet it is believed that the error is not fatal. The order requires the parties to put in a good and sufficient answer to the bill, or a plea or demurrer to the same, on or before the fourth day of December term next of this court, and requires the service to be made before the 25th February next ensuing the date of the order, which is 19th December, 1833.

This court will judicially notice, that several terms of the Chancery court intervened between the date of the order and the term, which was to be held in the ensuing December. The expressions of the order are, therefore, inconsistent. The ensuing December term was not the next term of the court. And the question is, whether we shall restore consistency by rejecting *December,* or rejecting *next.*

The court must take notice, that all the processes of the Chancery, like those of other courts, are issued and made returnable from term to term; and that the order, *pro confesso,* is a process issuing under the provisions of the act of 1799, ch. 79, sec. 2, which directs the chancellor, in case the defendant has been returned attached, to pass an order limit-

ing a day in the following term, on or before which the defendant must answer, &c. &c.; the act therefore required the time to be limited to the next term, and this court will assume that the court of Chancery intended so to frame its order, and more especially as the decree passed at the next ensuing term, expressly declares, that the defendants had failed to answer within the time limited by the order.

The defendants at this time were in contempt, and therefore are not entitled to the favourable consideration of the court. It will also appear, that they went before the auditor and took testimony in relation to the matters of account, and gave instructions in relation the account, and on the return of the accounts, the case was actually submitted in writing by the counsel for all the defendants. These facts prove they had notice of the decree, *pro confesso*, and suffered no injury from the inaccuracy of the order. If they were aggrieved by the decree and order, they ought to have moved to set them aside.

3. That there is no evidence that *William Cooke*, who assigned *Mrs. Dulany's* claim to *Thomas Buchanan*, was her attorney.

As the assignment was made over thirty years ago, and no objection has ever been urged against it, we might presume the authority of the attorney.

But this objection comes with a very ill grace from parties who prove they have made two, and allege they have made other payments to *Buchanan*, as assignee; who have permitted *Mr. Neth* to take an assignment from that first assignee, have settled an account with him, and made him sundry payments. It is precisely the requital which a man may expect for excessive lenity to his debtors.

The conclusive answer to the objection is, that the bill and the amended bill charges the assignments, and the decree, *pro confesso*, establishes that fact against *Mrs. Dulany*.

It is then objected, that the decree is for the sale of all the lands mentioned in the proceedings, for the payment of the two sums of £230, and £400, with interest thereon, when

the complainants' own exhibit show, that *George Fitzhugh, the elder's* life estate in 500 acres, and his fee simple estate in 188 acres, were never charged or chargeable with payment of the debt of £400.

As *George Fitzhugh, the elder,* is dead, no question can be raised as to the liability of his life estate to be sold. That life estate is expired. The whole estate has vested in possession in *Mary, Daniel,* and *George,* the children—and it will not be pretended that their interest ought not to be sold.

Then as to the fee in 188 acres. The bill alleges, that on the 10th October, 1791, *George Fitzhugh, the elder,* conveyed to *Walter Dulany,* certain real and personal property in said conveyance, mentioned in trust, to secure the debt for £230. That afterwards the said *Walter Dulany* conveyed all the aforesaid real and personal property to *Mary Fitzhugh, George Fitzhugh, Jr.* and *Daniel D. Fitzhugh.* That on the 7th of April, 1805, the said grantees conveyed certain real and personal property, which is particularly described in the conveyance, to one *Rebecca Dulany,* and the said *Walter Dulany,* in trust, or by way of mortgage, to secure the debt of £230, and the debt of £400. That these two debts, and the mortgage last aforesaid, have been duly assigned to *Lewis Neth.* That on the 2d April, 1822, these mortgagors came to a settlement with *Lewis Neth,* and executed to him their bond for the balance due, and on the 26th January, 1825, they executed a further deed or agreement, whereby it is declared, that the bond of 1822, was given to secure the principal and interest remaining due on the debts secured by the mortgage, and that the sum secured, to be paid by the bond, was a continuing charge on the mortgaged property.

The language of this last instrument, which is the complainants' exhibit D, is conclusive, to show that the parties to that instrument admitted the right of *Mary, Daniel,* and *George, Jr.* to mortgage the property, which is mentioned in the deed of 1805, and that *all* the debts thereby provided for, were well charged on *all* the property mentioned therein, and thereby *intended* to be conveyed. If, then, the averment in

*Daniel D. Fitzhugh's* answer, and the proofs offered on behalf of all the defendants before the auditor be credited, viz : that the instrument was executed by *George Fitzhugh, the father*, and not by the son—we shall have the father's conclusive admission, that the title to all the property mentioned in the deed of 1805, was, at the time of its execution, well vested in the mortgagors, and that they had authority to charge the same.

But if that averment and proof should be excluded, and if it should be taken that the bond of 1822, and deed or agreement of 1825, were executed by *George, the son*, the same presumption of title may be made from other circumstances—such as the relation of father and children, which subsisted between those parties—the very great probability, that the father had notice of the deed from *Walter Dulany*, to his children, and of the mortgage from his children, to *Rebecca* and *Walter Dulany*, and his acquiescence in these conveyances for more than 30 years, during which, the debts had been passed by two separate assignments.

Nor is it to be overlooked, that the deed from *George Fitzhugh, the father*, to *Walter Dulany*, is not a mortgage, but a trust to sell absolutely for payment of debts.   Nor is there any apparent consideration for the deed of 1805, which charges the father's debts on the estate of the children, unless it be affirmed that under the deed from *Walter Dulany* to them, with the father's assent, they had acquired all the residuary interest in the father's estate ; upon the whole state of the case it is submitted as a fair inference, that the father finding himself irretrievably involved, had assigned all his property to his children, on their undertaking to discharge his debts.   Upon this hypothesis their right to make the mortgage of 1805, would be unquestionable.

But it is to be observed, that *George Fitzhugh, the father*, is dead, and that his heirs, *qua heirs*, are not here objecting to this decree, as burthening unjustly his estate.   The objection comes from his children, the mortgagors, who pretend that they had no title to the lands which they undertook to

convey in 1805! Can *they* be permitted to impeach their own deed, upon the ground of a defect in their own title.

If the surviving appellants think their case can be improved by their assuming the relation of heirs at law of the father, we will recognize them as parties in this character, and we believe that in point of fact, they are entitled to assume that character. Upon this assumption, the former right of the father will have devolved on them. And they will now have the title which they professed to have in 1805, and which they professed to convey by the deed of that date. Can they set up this after acquired title to defeat their own conveyance. As between the grantee and a stranger, it may be true, that the deed passed no more than the title, which the grantors had at the time of its execution. But as between the grantors and grantees, the deed itself is conclusive as to the title, and as to conveyance of title, and *estops* the party grantors from denying title, &c. or setting up an inconsistent title.

If we turn to the answer of *Daniel Fitzhugh*, we shall find admissions of every fact material to our recovery, and he does not rely on defect of his title to avoid his own act. Can he rely on a defence which he has not put in issue by his answer.

The bill has been taken, *pro confesso*, against the other defendants to the bill. Every thing in the bill is, therefore, admitted by them. Now the bill alleges, that the father conveyed certain property to *Walter Dulany*, that *Walter Dulany* conveyed the same property to the children. That the children made a conveyance to *Rebecca* and *Walter Dulany*, and by referring to the deed, which is part of the bill, we find it includes the very property which the children had acquired from *Walter Dulany*, and the bill charges the right of the complainant to have his debt raised out of the whole estate. If all the facts charged in the bill had been admitted to be true, could the defendants afterwards have relied on their defect of title? And has not the statutory confession the same effect precisely as an express admission.

7. This point assumes as a preliminary, that the father had a fee in 188 acres, and an estate for life in 500 acres, and the

reversion of this 500 acres was in the children. And hence concludes, that the bond of 1822, and agreements of 1825, are ineffectual, unless it can be shown that the father and all the children were parties to these instruments.

If the argument on the last preceding point, has succeeded in convincing the court, that in point of fact, the whole title of the father was vested in the children in 1805, or has since devolved on them, or that upon the present state of the proceedings, no question can be raised as to the title of the parties to the deed of 1805, then it will result that the assumption of fact is gratuitous, and the conclusion will be unwarranted.

The bill charges, that the bond and agreement were executed by *all the children*—the amended bill suggests the pretence, that they were executed by *George, the father*, and not by *George, the son*, but relies on the original charge. The bill is taken, *pro confesso*, against the father, *George, the son*, and *Mary*, and consequently they admit the execution of these papers by all the children.

*Daniel*, in his answer insists, that these instruments were executed by the father, but on general replication and issue, he fails to make out this point. He admits his own liability, and therefore shows he has no *interest* in denying that which *George, the son*, (the party to be charged,) has confessed.

But it may be argued, that after the cause was sent to the auditor, the defendants proved the instruments were executed by the father, and not by *George, the son*. In the points annexed to the appellee's statement, it has been already objected, that this evidence is inadmissible. At present, therefore, it will be sufficient to say, that if it is considered as evidence offered by *Daniel* or *Mary*, it is inadmissible, because they have no interest in showing the fact, and if it is considered as offered by *George, the son*, it is inadmissible, because it would contradict that which he has previously confessed on the record.

But if the evidence be admitted, it will show that the father, *Daniel* and *Mary*, executed, and are therefore bound

by the agreement of 1825. And that agreement admits the debts are properly charged on all the property conveyed by the deed of 1805.

Then if we turn to the mortgage of 1805, we shall find it was executed by *George, the son,* and we shall find endorsed on the bond of 1822, credits for certain payments made by *the son,* on account. *Of* these payments, all the defendants have claimed benefit before the auditor. The bond is therefore adopted as a settlement by the son, and binds as firmly in equity as if he had executed it.

8. The representatives of *Walter Dulany,* are parties to the amended bill. And a decree has been passed against them.

The points already filed, state the grounds on which it is supposed that *Upton Scott* is not a necessary party.

9. It would seem to be conceded by this point, that as between the parties; mortgagor and mortgagee, a conversion may be made of the interest into principal; and that the only question to be agitated is, whether such conversion can be made to the injury of a subsequent encumbrancer.?

The answer to this view of the objection is short. It does not appear that the *Bank of Maryland* acquired its mortgage before the date of the bond of 1822. The bank does not by its answer complain of that settlement—nor is it shown or alleged that the settlement will operate to the prejudice of the bank.

If it be intended to agitate the general question of the lawfulness of a conversion as between debtor and creditor, it will be submitted that the affirmative side is conclusively established by the authorities. Interest *already* accrued may be converted *into* principal, although a prospective agreement will not be enforced.

The printed statement already submitted will explain the principles which were adopted by the parties in their settlement. The interest due at the time of the assignment from *Mrs. Dulany* to *Mr. Buchanan,* was converted into principal. And like conversion took place at the time of the assignment,

by *Mr. Buchanan* to *Mr. Neth,* and at the time of the settlement with *Mr. Neth.* .

If the parties to be charged, joined in or assented to this conversion of interest into principal, the right of the assignee to claim the compound interest will be clear.   And it is clear that *George, the son,* if he did not execute the bond and agreement did confirm the same by the endorsements of payments made by him on account. .

But if his acquiescence was doubtful, it would not be difficult to show that under all the circumstances, the claim for the compounded interest ought to be sustained.

In 1665, *Ld. Clarendon* decided that on an assignment of a mortgage, all moneys really paid by the assignee, that were due to the mortgagee, should be principal to the assignee. . *1st Chan. Ca.* 67, *Smith vs. Pemberton.* -

It is conceded in this case that *Mr. Neth* gave full value for this mortgage.

In *Porter vs. Hobart,* 2 *Cha. Rep.* 441, 3 *Cha. Rep.* 43, *Ld. Bridgman* decreed, that interest should be converted into principal for an assignee—that is, that he should have interest on the whole sum advanced by him.   This decree was reversed by *Ld. Shaftbury,* in 1672.

It will be found that the peculiar circumstances of this case which commended the mortgagor to the political sympathies of *Ld. Shaftbury,* are the grounds for reversal.   In all subsequent cases it is treated as the *first* and *only* case in which an assignee was refused interest on the whole amount of his advances.

Thus, in 1674–5, *Ld. Notingham* declared it was always the rule that the mortgagee assigning, the assignee should have interest for the interest then due, and it *never* was contradicted but in *Porter vs. Hobart.* ˙ 1 *Chan. Ca.* 258 *Anon.* 1 *Vern.* 168, *Earl of Macclesfield vs. Fitten,* decided by *Lord North* in 1683.   2 *Vern.* 135, *Gladwyn vs. Hinchman,* by *Ld. Com. Maynard* in 1689, are to the same effect.

In 1745, *Ld. Hardwicke* affirms the same rule, with this qualification, that the assignment be made with the *concur-*

*rence* of the mortgagor. His consent to have interest converted into principal is unnecessary. *Arhenhurst vs. James,* 3 *Atk,* 271.

In 1 *Johns. Ch. Ca.* 15, *Ch.* inclines to the same opinion. It is remarked on this case that *Ch. Kent* formed his opinion in a great measure on the case of *Macclesfield vs. Fitten,* as reported in the old edition of *Vernon*—from which it would seem that the question was adjourned over. A new edition with notes by *Mr. Raithby,* has been since published, in which it is shown from the *Register's Book,* that the case was actually decided in favour of the assignee, and *Ld. Keeper North* declared the like rule should prevail in all future cases.

10. This point may be disposed of with two short remarks.

1. If the bill was multifarious the defendants ought to have demurred.

2. That in truth the relief is claimed on the second mortgage alone.

DORSEY, Judge, delivered the opinion of the court.

The appellants' first ground assigned for the reversal of the chancellor's decree is, that there is no evidence in the cause to sustain it, because, as is alleged, the commissioners did not take the oath annexed to the commission, and their proceedings under the commission are therefore null and void. Had this objection been taken by an exception filed at the proper time in the chancery court, it would necessarily have been considered and determined by the chancellor, and his determination would have been a fit subject for review in this court. But the question as now presented by the record is, by the 5th section of the act of 1832, ch. 302, excluded from our consideration. That section enacts "that hereafter in all causes in the court of chancery or any county court as a court of equity, all objection to the competency of witnesses, and the admissibility of evidence, and to the sufficiency of the averments of the bill or petition, shall

be made by exceptions filed in the cause, and no point relating to the competency of witnesses or to the admissibility of evidence, or the sufficiency of the averments of the bill or petition, shall be raised in such causes in the court of Appeals, or noticed, or determined, or acted on, by the court of Appeals, unless it shall plainly appear in the record that such point had been raised by exceptions as aforesaid in said court of chancery or county court." It is true that the defendants more than a month after the passage of the decree did file a series of objections to it, one of which was, that now relied on against the admissibility of the evidence taken under the commission. But such a proceeding was wholly irregular, and cannot be regarded as in any wise relieving the defendants from the effects of the prohibitory enactment of the above mentioned section. The manifest design of the legislature was, that all objections to the admissibility of evidence should be taken by exceptions filed in the cause before the passage of the decree, that the chancellor whilst decreeing, might have them in view, and that the opposite party might resort to the appropriate means of obviating their effects, whilst the cause continued before a tribunal where such resort could be had.

The *second* ground of reversal to wit: because it does not appear from the record that the defendants in the original bill were summoned to answer to the amended bill, is equally unsustainable. When the amended bill was filed, none of the defendants had answered, save *Daniel D. Fitzhugh*, who, in his answer to the original bill had fully responded, as to all the matters in the amended bill by which his interest could be affected. To have required of him a second answer, would have been such an act of supererogation, as is never imposed upon its suitors by a court of equity jurisdiction. As regards the other defendants to the original bill they were called upon by the amended bill simultaneously to answer both. Such a call we deem sufficient, and no valuable result could have been obtained by the issue of new subpœnas.

The *third* ground is because the order, *pro confesso*, of the 19th December, 1833, was not served upon *George Fitzhugh* and *Mary Fitzhugh* by the 25th *February*, 1834, or at any other time. This we think equally untenable. In the absence of all direct proof to the contrary, we regard the statement of the chancellor in his order of the first of April, 1834, "that the above mentioned order had been duly served," sufficient evidence of the truth thereof. *Rigden vs. Martin*, 6 *Har. and John.* 407.

The *fifth* ground asserts that there is no evidence that *William Cooke* who signed the assignment to *Thomas Buchanan* as attorney for *Rebecca Dulany* was the attorney of *Rebecca Dulany.* Such an objection comes with an ill grace from the defendants under the circumstances of this case. The assignment was made in 1806. It has been acquiesced in, and recognized by the appellants from that time, until the filing of their notes in this court, a period of more than thirty years. They have for about twenty-five years continued time after time, to pay to the said assignee and those claiming under him interest due on the debts assigned. *Daniel D. Fitzhugh*, one of the appellants, in his answer in express terms admits the assignment of the debts due to the said *Rebecca Dulany*, to *Thomas Buchanan ;* and three of the four appellants, by a bond and agreement under their hands and seals, the first dated in 1822, the second in 1825, by necessary implication, and also in the said agreement in express terms admit the assignment and its validity, and in like manner make the same admission in 1835, in their instructions to the auditor to state the accounts. And they exhibit and claim credit for a receipt given in 1808, by *Thomas Buchanan*, (and which has been allowed to them) in which this assignment is expressly stated. In addition to all this, a decree, *pro confesso*, has been entered in this cause against *Rebecca Dulany* and her representatives, by which she admits all the allegations in the appellee's bills, one of which is the assignment of the said mortgage debts of the said *Rebecca Dulany.* Under circumstances like these to

compel the appellee to produce further proof of the validity of the assignment in question, would be a departure from the settled doctrines of a court of equity, and at war with the dictates of reason and common justice.

The *sixth* ground assigned is " because the decree is for the sale of all the lands mentioned in the proceedings for payment of the two debts of £230 and £400 added together and interest compounded thereon; when complainants' exhibits A and B shew that the life estate of *George Fitzhugh, the elder,* (who held a life estate in 500 acres) and his fee simple estate in 188 acres never were charged or chargeable with payment of the debt of £400. To this objection it is only necessary to refer to the aforesaid bond and agreement of 1822 and 1825, in the latter of which the said *George Fitzhugh, the elder,* ratifies and confirms the said mortgage of 1805, and makes as far as he is concerned, the land and premises therein mentioned, including both his said life and fee simple estate, liable for the debt for which the chancellor has decreed its sale.

We do not concur with the appellee's counsel, when they insist on the rejection of *Samuel Ridout's* testimony, as having no relation whatever to the matters of account referred to the auditor, nor do we believe it to be the interest of the appellee that we should do so; but for the proof that the bond and agreement of 1822 and 1825, were executed by *George Fitzhugh, the elder,* it is not easily discoverable from the record how his life estate in the 500 acres, or his fee simple in the 188 acres, can be charged with the debt of £400, on the compound interest thereon and on the £230 debt. But for this proof the auditor's statement No. 5, could not be sustained as against *George Fitzhugh, the elder,* nor could the decree of the chancellor predicated upon it, share a better fate. The accounts between the parties, the charges upon the respective mortgaged estates of the several appellants, could not have been correctly stated by the auditor until the facts established by *Ridout's* testimony were laid before him. The order of the chancellor

therefore was in this respect a sufficient warrant for the acts of the auditor.

The *tenth* ground upon which a reversal of the decree of the chancery court has been claimed is, " because exhibits A and B, being conveyances of different estates, by different parties, at different times, to secure (in part) different debts, ought to have been the subject of separate and distinct bills, and could not properly be embraced by one. There is no weight in this objection. The chancellor could not have decreed definitively in reference to the mortgaged premises or any of the rights of the respective parties upon any other bill than that which embraced in it, all the conveyances. Had the bill been filed only upon the deed of 1791, and the defendants in their answer had set out the deed of 1805, the complainant would have been compelled to amend his bill, and introduce into it the latter conveyance, and had the respondents then have set out the bond of 1822 and agreement of 1825, the complainant must again have asked leave to amend his bill to charge in it, the execution of such bond and agreement.

The correctness of the decree therefore stands unimpaired by any thing alleged in the first, second, third, fifth, sixth, and tenth grounds, on which, its reversal has been insisted on; but under the present proceedings and proofs in the cause it cannot evade the force of the fourth, seventh, eighth, and ninth objections.

The fourth is because the said order, *pro confesso*, (meaning the order of the 19th December, 1833,) gives the defendants until the 4th of December, 1834, to answer the bill, and yet a decree, *pro confesso*, was passed against them on the 1st day of April, 1834. To have made absolute the order, *pro confesso*, as was done on the 1st day of April, 1834, the chancellor must have been satisfied that the order of the 19th of December had been served upon the defendants, and that they were knowingly guilty of a default in not filing their answer within the time limited by the order. It is true that a solicitor in chancery, knowing the terms of the

Chancery court to be held in *March, July, September*, and *December*, and that by the second section of the act of assembly of 1799, ch. 79, the chancellor was not authorized to fix a day for the filing of the defendants' answer, beyond the ensuing March term, would contrary to the natural import of its terms have understood the order as fixing the time for filing the answer on or before the 4th day of *March*, next term, instead of on or before the 4th day of *December* term next, yet it would be unreasonable and inconsistent with the principles of equity and justice to impute to an uninformed suitor, the same knowledge and understanding, to visit on him the sins of a wilful defaulter, and to punish him accordingly. We think therefore that the order, *pro confesso*, of the 1st of April, 1834, was erroneously passed, and can give no support to the decree in this cause.

The point raised by the appellants' seventh ground under the insufficient proofs taken in the cause cannot be resisted. To bind the interest of *George Fitzhugh, junior*, in the mortgaged premises for the interest compounded at the dates of the assignments of the mortgage debts to *Buchanan* and *Neth*, his concurrence in the making of such assignments must be proved, or his subsequent ratification of, or assent to such compounding must be shewn—he cannot infer it solely from the credit claimed from exhibit E, because the payments on which those credits rest do not appear from any testimony in the record to have been made by him, or with his knowledge or approbation. Had the appellee have proved (as doubtless he could have done) the truth of the endorsements of payments made on the bond of 1822, the difficulty in question would have been effectually obviated.

The eighth ground is, because the legal representatives of *Walter Dulany*, deceased, mentioned in complainant's exhibit A, and *Upton Scott*, or his legal representatives are parties in interest, and should have been parties to the cause. The debt due to the representatives of *Walter Dulany* having since the deed of 1791 been of more than forty years standing, and there being in the record nothing to show such a con-

tinuance, revival, or recognition of that debt, as would render it a subsisting lien upon the mortgage premises or any part thereof, and the appellee having in his bill of complaint alleged, that the said debt was paid and discharged; we think the presumptive bar from the lapse of time, is so conclusive against their claim, that it was not necessary that the appellee should have made them parties to this suit. But *Upton Scott*, or his representatives stand in a very different situation. *Daniel D. Fitzhugh*, one of the mortgagors, in the deed of 1805, explicitly admits in his answer, the present existence of *Upton Scott's* debt. Such admission although it does not so far revive the debt as to make it available, when in conflict with the claims of the appellee, does operate *to remove the presumptive bar from length of time so far as the rights of Daniel D. Fitzhugh* are concerned, and restores it to full life as an effective lien on all such interest of *Daniel D. Fitzhugh* in the mortgage premises as may remain after satisfying the claim of the appellee. *Upton Scott* then, if living, or his representatives in the event of his decease, have such an interest in the mortgage premises, that as parties to these proceedings they should have an opportunity of asserting and protecting their rights.

The 9th ground which is relied on by the appellants, for reversing the decree is thus stated, because the mortgagors cannot by any agreement compound the interest on the principal debt, and render the whole a charge upon the lands to the prejudice of those whose debts are secured by the same mortgage, and of the *Bank of Maryland* a subsequent mortgagee. The first branch of this proposition has not been, and cannot be contended for, if by debts secured by the same mortgage, is meant debts which are subsisting liens upon the mortgaged premises and are obnoxious on the part of the plaintiff, if otherwise conflicting with his claims, to no other bar to their recovery, than that arising from the compounding of interest. But the last branch of the proposition (as to the rights of the *Bank of Maryland*,) involving in its consideration some important principles of law, as yet unsettled in

*Maryland,* not appearing to have been decided by the chancellor and its decision neither tending to the affirmance or reversal of his decree, we mean to express no opinion upon it.

The proceedings in the cause have not as yet reached that state of maturity, which they must obtain before that question is presented for adjudication. The decree as respects the conflicting claims of the parties upon the mortgaged premises makes no decision ; it simply orders a sale of the property, and that the proceeds be brought into court for distribution. *Non constat* that as between such claimants there will be any conflict ; the mortgaged premises may sell for enough to satisfy all the liens upon it. In the event of its not doing so, when the auditor has stated the account distributing the fund, and not before, will the chancellor be called on to adjudicate upon the rights of the claimants.

It appearing to this court that the substantial merits of the cause will not be determined by the reversing or affirming of the decree of the chancellor, and that the purposes of justice will be advanced by so doing, it is thereupon this 22d day of December, 1837, ordered and adjudged by the authority of this court, that this cause be remanded to the court of Chancery, for the purpose of amending the pleadings, making *Upton Scott,* if living, or if dead, his legal representatives, a party or parties defendant, and that such further testimony be taken therein, and other proceedings had under the chancellor's direction, as shall be necessary for determining the cause upon its merits.

CAUSE REMANDED TO CHANCERY.